AO 91
Rev. 11/82

**CRIMINAL COMPLAINT**

☐ **ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>VICTOR VURPILLAT III | Docket No.<br>**SA08-680 M**<br><br>MAGISTRATE'S CASE NO. |
|---|---|

Complaint for violation of Title 18 United States Code § 1343

| NAME OF MAGISTRATE JUDGE<br>MARC L. GOLDMAN | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE<br>December 31, 2007 | PLACE OF OFFENSE<br>Orange County | Address of ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

   Beginning on or about a date unknown, and continuing through on or about August 22, 2008, in Orange County, within the Central District of California, and elsewhere, defendant VICTOR VURPILLAT III, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud Bob M., Mark B., Charles M., Hector B., and others as to material matters, and to obtain money and property from Bob M., Mark B., Charles M., Hector B., and others by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

   On or about December 31, 2007, within the Central District of California and elsewhere, VURPILLAT, for the purpose of executing the above-described scheme to defraud, transmitted, willfully caused the transmission, and aided and abetted the transmission of, the wire communication in interstate commerce of $75,000 from the Bank of America Account of Hector B., held in Las Vegas, Nevada, to VURPILLAT's Wells Fargo Bank Account Number XXX-XXX2922 in Ladera Ranch, California.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

   (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

**FILED**

DEC 10 2008

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br><br>B. CRAIG MASON - SPECIAL AGENT<br>FEDERAL BUREAU OF INVESTIGATION |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | **MARC L. GOLDMAN** | DATE: December 10, 2008 |
|---|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
AUSA: ACG:sia

<u>AFFIDAVIT</u>

I, B. Craig Mason, being duly sworn, depose and state as follows:

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") in Santa Ana, California.  I have been employed with the FBI since May 2003.  I am presently assigned to the Santa Ana Division of the FBI and work on a white collar crime squad that investigates wire fraud, mail fraud, and securities fraud.  As a result of my training and experience, I am familiar with federal laws relating to wire fraud, mail fraud, and securities fraud.

2.  This affidavit is made in support of a complaint and arrest warrant against Victor Vurpillat III (hereinafter "VURPILLAT") for a violation of  Title 18, United States Code, Section 1343 (wire fraud).

3.  The facts set forth in this affidavit are based upon my own personal observations, my training and experience, as well as information obtained during this investigation from other sources, including:  (a)  statements made or reported by various witnesses with personal knowledge of relevant facts; (b)  my review of records obtained during the course of this investigation; and (c) review of public records databases. Because this affidavit is submitted for the limited purpose of establishing probable cause to arrest VURPILLAT, I have not set

1

forth each and every fact I have learned in connection with this investigation.  Where conversations and events are referred to herein, they are related in substance and in part, and where figures and calculations are set forth herein, they are approximate.

### I.     OVERVIEW OF THE SCHEME

4.  As explained in greater detail below, my investigation to date has shown that VURPILLAT operated an investment scheme under his business Quaestor Partners from at least January 2006 through July 2008.  In essence, VURPILLAT solicited family members and close friends for money to invest in the day trading of securities, specifically index future contracts (hereinafter "the investment").  VURPILLAT misrepresented to investors that their investment was profitable, including fabricating account statements showing substantial gains on investors' accounts, when in truth and in fact he was using investor money for personal expenses and the minimal amount of trading that occurred was not profitable.

5.  VURPILLAT made numerous material misrepresentations to convince investors to invest and remain invested, including:

    a.  VURPILLAT would only be paid with fifty percent of the profits from the trading;

    b.  The most an investor could lose was twenty percent and if the investment lost more than twenty percent, it would be

2

liquidated; and

      c.   Month after month, VURPILLAT represented the investment as profitable, including emailing investors monthly account statements showing consistent profitable trading.

II.   <u>PROBABLE CAUSE</u>

A.   <u>QUAESTOR PARTNERS</u>

      6.   I have reviewed public record databases, and according to those databases, at all times relevant to this affidavit, Quaestor Partners Inc. (hereinafter, "Quaestor"), was a privately held corporation duly organized and existing under the laws of the State of California, with its principal place of business in Aliso Viejo, California.   VURPILLAT is the registered agent of Quaestor.   In addition, VURPILLAT filed for a Fictitious Business Name, doing business as Quaestor Partners, with its principal place of business in Aliso Viejo, California, listing VURPILLAT as the owner.   I have reviewed bank records which show that Quaestor maintained an account at Wells Fargo Bank, where investor money was deposited, and VURPILLAT was the signatory on this account.

B.   <u>VICTIMS</u>

      7.   On August 14, 2008, I interviewed investor Bob M. who told me the following:

      a.   From about January 2006 through May 2008, Bob M. invested $125,000 with his brother-in-law, VURPILLAT.   VURPILLAT

3

claimed to Bob M. that he was profitably day trading index futures and solicited him to invest with his company Quaestor. VURPILLAT said that he would not be paid if the investment was not profitable and that VURPILLAT would be entitled to keep fifty percent of the profits as his compensation.  In addition, VURPILLAT said that the most an investor could lose was twenty percent of the investment principal and that the investment would be liquidated if losses exceeded twenty percent.  VURPILLAT also emailed Bob M. a disclosure document that states VURPILLAT's compensation as fifty percent of the profits and the investment would be liquidated if it lost more than twenty percent.

      b.  VURPILLAT emailed a monthly account statement that indicated consistent gains each month.  Bob M. helped VURPILLAT design the template he used for the account statements.  Bob M. recognized the format of his account statements as the one he helped VURPILLAT design.  Bob M.'s account statement listed an overall return of approximately fifty-six percent for 2006, forty percent for 2007, and three percent gains per month in 2008.

      c.  Around early July 2008, Bob M. learned that his investment with VURPILLAT was worthless.  Bob M. received an email from VURPILLAT  on about July 7, 2008, that stated, in part, "Dear Family, it is with great sadness that I hurt each one of you with my betrayal of trust . . . . I also would like to state that my problem over the last two and half [sic] years was

4

a lying and fear problem of being found out..."

    d.   Bob M. is a Certified Public Accountant by training
and works as the Treasurer for a publicly traded company.  After
the scheme collapsed, VURPILLAT provided an investor with copies
of VURPILLAT's bank statements and trading accounts who provided
these documents to Bob M.  Bob M. traced most of the money
VURPILLAT received and spent as part of the scheme.  Bob M.
discovered that VURPILLAT spent over $600,000 on personal
expenses, including $5,500 per month in rent and tuition for his
children's private school, and that VURPILLAT lost about $360,000
investing.  Bob M. also reviewed VURPILLAT's trading records and
learned that of the approximate $360,000 that was invested,
VURPILLAT lost money each month trading.

    e.   After Bob M. conducted the analysis of VURPILLAT's
bank accounts and trading records, he confronted VURPILLAT about
using investor money for his family and personal expenses.
VURPILLAT told Bob M. that all of the investment money was gone
and that it was either lost trading or spent on VURPILLAT's
living expenses.  VURPILLAT also said that he kept the charade
going because he wanted to make the money back for everyone.

    f.   Bob M. did not receive any money back, including
profits and principal, from his investment.  It would have been
important for Bob M. to know that VURPILLAT was using investor
money for personal expenses and losing money trading in Bob M's

decision to invest and stay invested with VURPILLAT.

8.     On August 26, 2008, I interviewed investor Mark B. who told me the following:

a.     Mark B. lost approximately $145,000 investing with VURPILLAT's Quaestor investment.  Mark B. heard from other family members how VURPILLAT was conducting a profitable trading program through his company, Quaestor.  Around the end of 2007, Mark B. discussed investing with VURPILLAT who told Mark B. that he was trading S&P futures contracts profitably.  VURPILLAT also said that he would keep half of the profits as his compensation and that the most Mark B. could lose was twenty percent of his investment.  VURPILLAT also said that Mark B. could liquidate his investment at any time provided he gave a ten day notice.

b.     Mark B. received monthly account statements that were emailed from VURPILLAT to Mark B. each month.  These statements showed that the investment was profitable month after month.  Mark B. also discussed his investment with VURPILLAT who indicated that he was profitably trading the account and the investment was making money.

c.     Around early July 2008, Mark B. learned from other family members that there was no money left in the investment.  Around July 9, 2008, Mark B. received an email from VURPILLAT who apologized for his "betrayal of trust" and promised to make things right.  After receiving this email, Mark B. called

6

VURPILLAT and accused him of lying and stealing his money. During this phone conversation, VURPILLAT admitted that he lied and defrauded Mark B. and that he was essentially running a Ponzi scheme.

d.   Out of the $145,000 invested with VURPILLAT, Mark B. received approximately $2,300 back from his investment.   It would have been important for Mark B. to know that VURPILLAT was using a large portion of investor funds for his family and personal expenses and was not trading profitably.

9.   On September 9, 2008, I spoke with investor Charles M. who told me the following:

a.   Charles M. is VURPILLAT's father-in-law and he lost approximately $433,000 investing with VURPILLAT from about January 2006 through July 2008.   VURPILLAT explained to Charles M. that he was profitably trading futures contracts through his company, Quaestor Partners.   VURPILLAT explained to Charles M. that he would be keep half of the profit as his compensation and the most Charles M. could lose was twenty percent of his investment.

b.   VURPILLAT provided Charles M. with monthly account staements that showed the investment earning a profit month after month.   VURPILLAT emailed these statements to Charles M. and he would also discuss the investment almost daily with him. VURPILLAT consistently had positive things to say about the

7

investment and gave Charles M. the impression that the investment
was profitable and doing well.

      c.  VURPILLAT also provided Charles M. with IRS Form
1099s for the 2006 and 2007 tax years that listed profits from
the investment.  Charles M. included the profits listed on these
forms as income on his 2006 and 2007 personal income tax returns.

      d.  VURPILLAT rented a large house about one mile from
Charles M's residence and the family would frequently have
gatherings at this house.  While in VURPILLAT's home, Charles M.
observed VURPILLAT's home office and computers where VURPILLAT
claimed to Charles M. he conducted the trading.

      e.  The scheme collapsed in early July 2008 when
Charles M. needed $30,000 from his account by the following
Wednesday and asked VURPILLAT for the money within a few days.
Shortly after this request, Charles M. received an email from
VURPILLAT where he apologized for taking investor's money and the
collapse of the scheme.  VURPILLAT also left a note in Charles
M's home that stated, "I can't go on living this lie to my family
any longer..."  VURPILLAT provided Charles M. with copies of
VURPILLAT's overall trading records and bank statements regarding
the investment.  Charles M. provided VURPILLAT's records to
investor Bob M. to conduct an analysis.

      f.  It would have been important for Charles M. to know
that VURPILLAT was not trading profitably and using a large

portion of investor money on his family and personal expenses. Charles M. is in the process of revising his personal income tax returns for 2006 and 2007 to show losses on his investment, versus the gains previously indicated by VURPILLAT.

10.  On October 16, 2008, I spoke with investor Hector B. who told me the following:

a.  Hector B. lost approximately $105,000 with VURPILLAT and his company, Quaestor, from about late 2007 through July 2008.  Hector B. learned through other family members that VURPILLAT was conducting a profitable trading program and contacted VURPILLAT to invest.  VURPILLAT claimed that he was conducting a profitable trading program and would only be paid with fifty percent of the profits from the investment.  VURPILLAT also said that Hector B. would lose no more than twenty percent of his total investment and explained that the investment would be liquidated if losses exceeded this twenty percent threshold.

b.  VURPILLAT emailed Hector B. monthly account statements.  These statements typically indicated gains of about five to ten percent each month.  Hector B. would also discuss the investment with VURPILLAT who reassured Hector B. that his account was profitable and doing well.

c.  On or about December 31, 2007, Hector B. was visiting family in the Orange County, California, area and met with VURPILLAT regarding the investment.  Hector B. went with

9

VURPILLAT to the local Bank of America to invest $75,000 in VURPILLAT's Quaestor investment.  Hector B. has a bank account with Bank of America located at one of its Las Vegas, Nevada branches.  Hector B. directed Bank of America to wire $75,000 from his Bank of America account in Las Vegas, Nevada, to the account provided by VURPILLAT.

HECTOR B.'s $75,000 INVESTEMENT

11.  Wells Fargo Bank provided the FBI with a copy of VURPILLAT's Quaestor Partners account numbered XXX-XXX2922 (the "Quaestor Account") and VURPILLAT's personal account numbered XXX-XXX9125 ("VURPILLAT's Personal WFB Account").  VURPILLAT is the signatory on the Quaestor  account and VURILLAT and his spouse are listed on VURPILLAT's Personal WFB Account statements. I reviewed the Quaestor and Personal WFB Account statements that covered December 2007 through the end of February 2008 and learned the following:

a.  On December 31, 2007, there is an incoming $75,000 wire to the Quaestor Account that lists investor Hector B. and Bank of America as the originator.  The balance in the account, after the wire, is $80,963.98.  There are no other deposits to the account during this time period.

b.  Approximately $55,000 is transferred from the Quaestor Account to VURPILLAT's personal Wells Fargo Account.  A review of this account shows the money going to mostly personal

10

expenses, including:  Costco, dining out, groceries,

entertainment expenses, and rent.

RECORDED CONVERSATION BETWEEN INVESTOR BOB M. AND VURPILLAT.

12.  On August 22, 2008, investor Bob M. recorded a phone

conversation with VURPILLAT.  I reviewed the recording and

learned the following:

a.  VURPILLAT admits to spending approximately $600,000

of investor money on an affluent lifestyle and that his trading

was not profitable.  VURPILLAT also admits that the total losses

from the investment was $985,000 and that he lost about $250,000

in the first six months of the investment.

b.  VURPILLAT is confronted by Bob M. regarding the two

and half years of inaccurate account statements VURPILLAT sent

out and VURPILLAT responds:

> . . . .That was the hardest thing.  It's
> like I almost had to take a deep breath
> sometimes especially like at the end of
> the month or the beginning of the month
> when those statements went out and I
> knew we would be having dinner or
> whatever.  I did not know how much
> longer I could go on.  I'm not trying to
> make anybody feel sorry for me.  But,
> for the last year and a half, or even
> longer, because basically from August of
> 2006, that was when we literally had no
> money.  I was like desperate to just
> make sure that we paid the bills until
> something else came up.  Having to face
> everybody at the end of every month and
> just completely lie like that.  My
> parents did not raise me to be like that
> . . . . There is no excuse.  I am
> completely at fault . . . . The bottom

line is that if I wanted to be a real
man, I would have stepped up at the very
beginning and said you know what guys, I
really screwed up, I apologize, it's
been 3 months but I haven't made any
money. . .

## MISAPPROPRIATION OF INVESTOR FUNDS - TRADING RECORDS

13.   The FBI obtained VURPILLAT's Quaestor trading records

from the following companies:  TradeStation, TransAct Futures,

and Advantage Futures LLC.  VURPILLAT is listed as the signatory

on all three of the accounts.  A review of the account statements

for all times relevant to this indictment shows that VURPILLAT

did not conduct profitable trading and in fact, lost money

trading the portion of investor money that was actually traded.

### III.   CONCLUSION

14.   Based upon the foregoing facts and my training and

experience, I believe that there is probable cause to believe

that VICTOR VURPILLAT III has committed violations of Title 18,

United States Code, Section 1343 (wire fraud), including:

a.   Beginning on or about a date unknown, and

continuing through on or about August 22, 2008, in Orange County,

within the Central District of California, and elsewhere,

defendant VICTOR VURPILLAT III, knowingly and with intent to

defraud, devised, participated in, and executed a scheme to

defraud Bob M., Mark B., Charles M., Hector B., and others as to

material matters, and to obtain money and property from Bob M.,

Mark B., Charles M., Hector B., and others by means of material

12

false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

    b. On or about December 31, 2007, within the Central District of California and elsewhere, VURPILLAT, for the purpose of executing the above-described scheme to defraud, transmitted, willfully caused the transmission, and aided and abetted the transmission of, the wire communication in interstate commerce of $75,000 from the Bank of America Account of Hector B., held in Las Vegas, Nevada, to VURPILLAT's Wells Fargo Bank Account Number XXX-XXX2922 in Ladera Ranch, California.

                                    _____
                                    B. CRAIG MASON
                                    SPECIAL AGENT
                                    Federal Bureau of Investigation

Sworn to and subscribed before me
this 10th day of December, 2008

_____
HONORABLE MARC L. GOLDMAN
United States Magistrate Judge